Good morning, Your Honor. Tony Farmani on behalf of Mr. Morello, the appellant. Your Honor, what Mr. Morello did was really bad, and the victim suffered considerably as a result of it. However, this could not have been a murder case, Your Honor, and the reason for that is very simple. The prosecution from the very outset had difficulty and recognized the difficulty of being able to prove causation, i.e. whether or not Mr. Morello's conduct actually caused the victim's death. There's no question that the victim had pre-existing conditions, and there's also no question that she died of aneurysm, and those pre-existing conditions are the most common cause for aneurysm. Recognizing that the person who performed the autopsy here, Dr. Garber, was unable to meet the prosecution's burden of proof, the prosecutor brought in two different experts to testify. One was Dr. Cohen. Dr. Cohen did not have any definitive conclusion about the cause of death. He thought it could have been torso trauma. He also thought it could have been caused by head injury. He just simply wasn't sure, so there was no real reason to bring in Dr. Cohen, quite frankly, other than that he was from the coroner's office, and therefore maybe gained some credibility with the jury. On the other hand, Dr. Blair did testify that the victim died as a result of torso trauma. There's no question about it, and this is not an insufficiency of the evidence issue. If it were, then there certainly was sufficient evidence to support causation. However, what happened, and there's no question that it was a constitutional violation here, what happened, and the manner in which it happened, is that the prosecution, again, recognizing that Dr. Blair's testimony was contradicted in very material respects by the defense expert, who was Dr. Herman, he brought in the testimony of Dr. Garber through cross-examination of Dr. Herman. Now, Dr. Herman not only testified that there was absolutely no connection between what Mr. Morello did and the victim's death, but he also contradicted Dr. Blair's testimony. So Dr. Blair's testimony by itself was simply not that great, if you will. So the prosecution brings in Dr. Garber's testimony, who says that the head injury was what caused the death. However, as you know, Dr. Garber's testimony was subject, I mean, the trial court who initially heard Dr. Garber's testimony said that it would not withstand a light of day in a trial setting. It just simply was not enough. So it might, you know, when you look at the facts of this case, when you look at the causation issue, you have to, it would be inescapable, Your Honor, to find otherwise that Mr. Morello's murder conviction is simply not, would not withstand constitutional scrutiny. Like I said, if you have any questions. Counsel, Judge Gould, I have a question for you. Well, I assume it was a constitutional error under the Confrontation Clause to extract the Dr. Garber testimony in the cross-examination or refer to it in closing argument. But then could you please address whether there is substantial and injurious effect, the standard under Brecht, which I think does have to be shown to get relief. That's correct, Your Honor, it does have to be shown. And as I argued in the opening brief and in the reply brief, Doctor, there's essentially five factors that the Supreme Court has said you must go through in order for you to find whether or not it had a substantial injurious effect on the jury's verdict. And those five factors begin with whether or not the testimony was important to the prosecution's case. There's no question about it. The testimony of Dr., the inadmissible testimony of Dr. Garber gave the jury another reason, another reason for causation. Of course, the jury never heard how speculative that opinion was. All they heard was that the person who performed the autopsy, the person who was most knowledgeable about what happened, because he was there, the police were there, that person said that this was caused by a head injury. And the prosecution, from the very outset, starting from the opening argument through the witnesses down the line, talked about how the victim here suffered from head injury, brain injury, so sort of reinforced it. So the first element, whether or not it was extremely important to the prosecution's case, no question about it. I mean, it has to be just important, but in this case it was extremely important to the prosecution's case, because I think without it, the prosecution would be left with Dr. Blur's testimony, which was, again, contradicted in material respects by the defense expert, Dr. Herman. And for good reasons, Your Honor, for good reasons, because Dr. Blur, if you take his testimony at face value, it simply doesn't add up. I know the jury resolves the conflicts, but if Dr. Blur's testimony by itself wasn't enough, that's evidenced by the jurors' questions, Your Honor. The jury had questions about, not only did they want readbacks of the testimony of all doctors involved, and presumably Dr. Garber's inadmissible testimony, they also wanted a way to reduce the murder charge to vehicular manslaughter, something lesser than first-degree murder. And it's worth emphasizing, Your Honor, that Mr. Morello's intent here was simply irrelevant. There was no evidence whatsoever, and the prosecution didn't have to show intent, because this was felony murder. So all you had to show was causation, and in that regard the prosecution failed. And the second element, Your Honor, would be whether or not the inadmissible testimony here, Dr. Garber's testimony, is cumulative or corroborated. It was neither. None of the doctors, none of the testifying experts said that the head injury was the cause of death. In fact, all of them disputed that, or denied it. They said there's no correlation between the two. So it was not cumulative, and it was not corroborated. The third element is the extent of the cost examination. Now, for that purpose, Your Honor, you can't take the cost examination during the preliminary phase of the case to substitute in for the cost examination at trial for two reasons. Number one, well, the Confrontation Clause demands that the cost examination be done in front of the jury. That's right in the Constitution. It's clearly established law way before the new case by the Supreme Court that had already established that. Secondly, Your Honor, the prosecution here never showed unavailability. If you don't show unavailability of the witness, you can't use their preliminary testimony, or you can't say that the defendant had an opportunity to cross-examine. It just simply does not go into the equation. Then the prosecution's, then the court says, let's look at what the prosecution's evidence was. Was the causation evidence here weak or not? As I explained earlier, Your Honor, there's no question that the causation evidence here was weak. If it weren't weak, there was no reason for the prosecutor to come at the end of the, almost at the end of a trial, to come out and bring Dr. Garver's testimony, because he felt insecure about his case. And that's the logical inference that could be drawn. And not only that, he reinforced Dr. Garver's inadmissible testimony during his closing argument and during rebuttal. He came right out and said it. He said, you can't discount the fact that the Garver, Dr. Garver, the guy who performed, the doctor who performed the autopsy had come to the conclusion that a head injury caused the death. The last element, Your Honor, would be, actually that was the last element. Basically, the five factors, excuse me for that, basically the five, the four factors that the Supreme Court has asked for the court to evaluate in order to determine whether there was a substantial injuries effect, Mr. Morella meets all of them, clearly meets all of them. Thank you, counsel. That's a very helpful presentation. Thank you. All right. Are there any further questions? If you'd like to reserve it. I would like to reserve my time. Thank you. Go ahead. Good morning, Your Honors. Christopher Beasley, Deputy Attorney General on behalf of the warden, the appellee. In order for Mr. Merillillo to obtain relief, he has to make two showings. Under AEDPA, he must show that the state court's determination of the harmlessness of the constitutional error was objectively unreasonable. And if he is able to show that, then we can go to the Brecht analysis and determine whether the error had a substantial and injurious effect upon the verdict. Mitchell v. Esparza, out of the United States Supreme Court, clearly specifies that both of these prongs must be satisfied. And this court in Incebon said as much. Here, Merillillo has not made either showing. He cannot show that the state court's determination of harmlessness was an unreasonable application of Chapman, nor can he show that it was an unreasonable determination based upon an unreasonable determination of the facts. The Court of Appeal, the California Court of Appeal here, went through the record and clearly articulated why the error, if there was error, was harmless. It looked at the voluminous evidence that was presented on the causation issue. Dr. Garber's hearsay evidence, his opinion that the brain injury may have been a cause of death, a contributory factor, was de minimis in comparison to the weight of evidence that was presented by the prosecutor. Counsel, I have a question for you on that, if I may, please. It's certainly true that there was a lot of testimony and evidence on causation from the three testifying doctors, two for the government and one for the defendant, but their testimony was somewhat contradictory and pointing in different directions. So why should we not say that the use of Dr. Garber's hearsay testimony gives us grave doubts about the conclusion? Because the testimony from Dr. Garber really was never the focal point. If we look at the purpose for why the prosecutor elicited that testimony from Dr. Herman, it was not to provide the jury with a new theory of causation. Instead, the entire point of the prosecutor's cross-examination was to demonstrate Dr. Herman's, the defense pathologist's, bias. He showed that Dr. Herman regularly is courted by the defense bar to come in and provide testimony when the defense bar is not appreciative of the testimony or the conclusions that are reached by pathologists that the prosecution wishes to present. So the question that the prosecutor asked was really set up in such a way so as to determine, to show and expose the bias that Dr. Herman had. The questions were, you've read the pathologist who conducted the autopsy reports. Yes. And that pathologist reached an opinion. Yes. And that opinion was that brain injury may have been a contributory factor. Yes. And you disagree with that, don't you? Yes, I disagree with that. Didn't also the prosecution's expert, Dr. Bloor, didn't he also disagree with Dr. Garber's finding that it was a head injury? He thought that it was a torso injury. That's correct. Dr. Bloor, the focus of Dr. Bloor's testimony was that it was torso trauma that exacerbated and ultimately led to the aortic dissection. And so that's correct. The prosecution's own experts disagreed with the notion that brain injury was a contributory factor. The purpose of eliciting this information is to discredit the defense expert. Isn't he also discrediting his own experts? I don't understand how that would really be his purpose. It sounds more like the purpose was what the defense is saying, that it was in order to introduce a new and different option for the jury to consider as to the cause of death. No, because Dr. Bloor's testimony, Dr. Cohen's testimony, let's just go back to Dr. Cohen, the fact that there was brain injury was no surprise to the jury. There was ample evidence that was presented. The jury saw CT scans. The jury was able to hear Dr. Cohen talk about the ventricular hemorrhaging, the subarachnoid hemorrhaging, the subdural hematoma that Mrs. Crony had suffered. This was nothing new to the jury that there had been trauma. The fact that Dr. Herman disagreed completely with all the other pathologists was what was trying to be established, that he had that bias. Just because Dr. Bloor's testimony may have been contradicted by Dr. Garber's opinion that brain injury was a contributory factor, doesn't necessarily discredit Dr. Bloor. If the prosecutor really wanted to present this evidence that Dr. Garber had the opinion that brain injury was a cause in fact, the prosecutor could have gone through the steps to present that in the prosecutor's case in chief. The prosecutor could have established unavailability and then would have been able to get all of that testimony in because it was all cross-examined in the preliminary examination. The prosecutor wasn't relying upon that as a method for the causation of death. The prosecutor was simply trying to eviscerate Dr. Herman's credibility before the jury. Then, when you look at the way the prosecutor ultimately argued the case, the prosecutor didn't focus on the brain injury as a cause in fact. The prosecutor consistently talked about the aortic dissection as being the cause. The prosecutor didn't ever tell the jury. And if you can't agree as to the cause, and if trauma to the torso caused the aortic dissection, you can always fall back on the brain injury causing death. That's not what the prosecutor argued. That was not the purpose of that testimony, and the prosecutor didn't focus upon it. And when we look at how the Court of Appeal analyzed how this all played out, there was nothing objectively unreasonable in the way that the Court of Appeal ultimately reached its conclusion that the error in admitting that opinion was harmless. And if there was nothing objectively unreasonable about the way that the Court of Appeal applied Chapman in this case, then the appellant cannot obtain relief under AEDPA. He also can't show that this was substantial and injurious under Brecht. Now, the reason that I bring up these two different prongs is because of Richter. In this court's decision, Pulido v. Krones, there is language in that decision that makes it sound like Brecht is the only determination that we have to make. But that doesn't square with Richter. Richter tells us that it is the state courts that's the main event. It's in the state court that constitutional claims are adjudicated. And in Richter itself, the state court made a determination as to a Strickland application. Then the Court of Appeals decided that the Strickland application was unreasonable because the Court of Appeals, in its own de novo review applying Strickland, concluded it wouldn't have held water with us, therefore the state court's opinion must have been unreasonable. But the Supreme Court says that's not the right analysis. The right analysis is, could differing jurists disagree? If they could disagree, then there's no relief that's available because it's an objectively reasonable application of controlling Supreme Court precedent. If Pulido, out of this court, were to stand and that Brecht were the only determination that needed to be made, then this court could substitute its de novo harmless error analysis for that of the Court of Appeal. Exactly the same way as happened in Richter, in which the Court of Appeals made its de novo determination under Strickland and then concluded, because we conclude otherwise, therefore the state court was wrong. But that's not the AEDPA analysis. Counsel, Judge Gold. So I'm willing to definitely assume for argument and maybe for decision that you've got this two-prong argument that there has to be both an unreasonable application of the harmless error standard and the Brecht showing of substantial and injurious effect. But the considerations on both these issues are somewhat similar. So then why is it not unreasonable to say that error was harmless in light of the fact that the other doctor's testimonies pointed in different directions and that the evidence was somewhat thin on causation? Of all the factors that were argued on injurious effect by your colleague on the opposite side, why don't they also show an unreasonable application of Chapman? They do not show an unreasonable application of Chapman because the Court of Appeal went through very conscientiously through the record. All of the things that opposing counsel has shown don't necessarily hold up when we look at the record in toto. If we look at the whole record and look at everything that was presented to this jury and look at the manner in which the prosecution presented the case and look at the manner in which the prosecution argued the case, those factors evaporate. Again, we must look at the context of the questions that were elicited and we must look at the fact that the prosecutor never argued that this brain injury was a cause, in fact, of death. That was not the focus of the argument. The focus of the argument was that it was the torso injury. You have used your time. Pardon? You're in the red. Oh, I'm so sorry. Are there any further questions? No. All right. Thank you. Your Honor, 25 on behalf of Appellant again. Your Honor, I begin by saying how disingenuous, unfortunately, the government is being here. The Court of Appeal said we also reject the people's implausible justification for allowing Garber's testimony to show bias. And the government just stood right here and said that's the reason why the prosecutor wanted to admit Dr. Garber's testimony in. That wasn't the reason. The reason was, as you pointed out, as Judge Gold pointed out, the causation issue, the pivotal issue in this case, was very, very, the evidence on that issue was very, very thin. The prosecutor was looking for a way out and got the way out by bringing in the testimony, inadmissible testimony of Dr. Garber. And another point here, Your Honor, the government talks a lot about how the Richter case should restrict your ability to grant habeas leave. Richter does not stand for the proposition that when someone's rights are violated, they're prejudicially violated, like in this case, you're forbidden from granting leave. It simply does not stand for that proposition. Have use of your time. Okay. Can I ask one question? Yes. Thank you. It sounds like the question here is whether or not Polito Crones says what it appears to say or not, because the reading of Polito says very clearly that the Brecht test was subsumed by the more liberal Chapman standard and that this court would only have to look at the Brecht test without regard for the state court's harmlessness determination. Do you agree or do you disagree that it's a one-prong or a two-prong test? Your Honor, I don't think it makes any difference, as Judge Gold has pointed out. But you are absolutely correct. The Polito case on page 1012 says it. I mean, it doesn't make any sense whatsoever to go through the process of 2254D1 and then go through the Brecht analysis, which is more restrictive. But I submit to you, Your Honor, no matter what analysis, no matter what prong you want to use, you come to the same conclusion in this case. There's no question about it. It simply doesn't matter. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is Hammons v. Harrison.
judges: Navarro, Schroeder, Gould